UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHELSEA L.,[1]
                                        Plaintiff                    DECISION and ORDER
-vs-
                                                                    1:23-CV-00933-CJS
COMMISSIONER OF SOCIAL
SECURITY,
                                        Defendant.
_____


INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the application of Plaintiff for Supplemental Security Income ("SSI")

benefits.   Plaintiff maintains that such determination is affected by errors of law and not

supported by substantial evidence.   More specifically, Plaintiff alleges that the ALJ erred

when determining Plaintiff's residual functional capacity ("RFC"), first, by making a finding,

concerning the amount of time that Plaintiff could remain on task, that is not based on

medical evidence, and, second, by failing to properly evaluate a medical opinion from a

treating mental health therapist.   Now before the Court is Plaintiff's motion (ECF No. 7)

for judgment on the pleadings and Defendant's cross-motion (ECF No. 9) for the same

relief.   For reasons discussed below, Plaintiff's application is denied, Defendant's

_____

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in
the United States District Court for the Western District of New York, any non-government party will be
identified and referenced solely by first name and last initial."

application is granted, and this matter is dismissed.

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step

sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v.*

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

---

*Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)]". Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review— even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original).

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the

4

Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'— that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).   "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

When considering whether a particular finding or decision is supported by

substantial evidence, a court cannot rely on any *post hoc* rationalizations offered by the Commissioner, but it may consider evidence that was evidently considered by the ALJ even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id*. *See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ....")."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').''); *Banyai v. Berryhill*, 767 F. App'x at 177

("An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered.") (citation omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action.   Briefly, Plaintiff claims to be disabled primarily due to mental impairments that have been variously characterized as attention deficit disorder ("ADD"), schizoaffective disorder, and borderline personality disorder.   Despite these impairments, Plaintiff from graduated from high school with a B average in regular education classes, attended college, and maintained employment for a period of years. Plaintiff claims, however, that her mental health significantly worsened after she began abusing various drugs, including prescribed Ritalin and street drugs such as marijuana and LSD, after which she withdrew from college and stopped working.   Plaintiff's abuse of powerful psychoactive substances resulted in several brief hospitalizations for drug-induced psychosis, as well as occasional so-called "flashbacks."   Although, apart from such episodes, Plaintiff's medical providers reported that, except for some mild depression and anxiety, her mental status was generally normal during the relevant period, with no complaints of delusions or psychosis.

For example, in July 2016, Plaintiff, then age 23, sought mental health treatment, and, specifically, medications, from Cattaraugus County Mental Health, purportedly to help her focus on her college studies and recover from deficits she claimed resulted from her abuse of LSD. Tr. 399-410.   As part of an intake assessment completed by Joseph

Ramsey, LMSW ("Ramsey"), Plaintiff indicated that in school she had been classified as learning disabled and took medication for attention deficit disorder ("ADD"), but that she nevertheless was a B student in regular education classes and graduated in 2011. Plaintiff further stated that her experience at school had been "fine," that she gotten along well with others, and that she had not had any major behavioral problems. Tr. 406. Plaintiff indicated that after high school, she had attended community college and worked at a Tim Horton's coffee shop "for a couple of years." Tr. 406.

Notably, Plaintiff indicated that she had stopped working at Tim Hortons because she did not like the job, and not because of any problems related to her alleged mental impairments. *See*, Tr. 406 ("Was previously employed at Tim Horton's for a couple of years.  She promises to never work there ever again.").  Indeed, Ramsey noted that Plaintiff was not claiming to be disabled from working. Tr. 403 ("Health Problems and Disability: Denies.").   Moreover, the record indicates that Plaintiff subsequently resumed working at Tim Hortons for a period, and that she also was subsequently hired by Home Depot.

Plaintiff further told Ramsey that during and after high school, she had had two long-term romantic relationships with boyfriends involving heavy substance abuse, which at various times led her to experience psychotic breaks.   In this regard, Ramsey's intake note states, in pertinent part:

> This individual has a long history of mental health and poly-substance abuse that she skirts around.  When confronted about her previous hospitalizations and her substance abuse problems . . . she reports that she has large chunks of time over the past several years that she cannot remember.   Her last hospitalization was June of 2015 at WCA Hospital in

Jamestown.   She reports that she has a history of ADHD and she was diagnosed with that when she was a child.   She reports that she has always been on either Vyvanse or Ritalin.   She reports that she was taken off of these medications in 2012 at Olean General after she had a psychotic episode.   She reports that she has had a couple of psychotic episodes in the past but nothing recenty.   . . .   She has had two episodes of psychosis that have occurred in the past few years.   She reports that both of those times things were have been pretty bad. [sic]   She also admits that she was doing drugs at the time that both of these incidents occurred.

***

She has lived a very chaotic life and is strongly attracted to men who have a lot of chaos in their lives and are very unsettled.   She has been in a couple of very intense relationships in which she has lost herself in the relationship trying to be the girl that she thinks the man she is with wants her to be.   This has caused her to develop a drug addiction, drinking too much, and [to] generally develop very unhealthy habits.   Relationships are a major source of stress and anxiety for [Chelsea].

***

She is also a diehard poly-substance abuser and she has put just about everything bad that a person can put into their body she has [sic] at one point tried or been addicted to.   She has quit doing LSD and I-25[6] as well as straight Acid and she reports that she only occasionally drinks and may twice a month smoke marijuana.[7]

Chelsea presents as a single, white female who has historical issues with attention deficit disorder, bipolar disorder, and borderline personality disorder.   The borderline personality disorder is clearly defined as she is a classic case – her relationships are intense and unstable, she engages in self-mutilation as both an attention seeking method and also [as] a valid coping strategy, and her other coping mechanisms consist of splitting and manipulating other people.   She seems to meet the criteria for PTSD more than any other mood related issue.   She is plagued by nightmares and racked by guilt over her previous relationships and her experimentation with LSD which caused her to have two inpatient hospitalizations.

---

[6]  The Court assumes this is a reference to 25i (25i-NBOMe), a synthetic form of LSD.
[7]  At the administrative hearing Plaintiff acknowledged that she smoked marijuana on a daily basis, twice per day.

Historically Chelsea is known to us at this facility.   She has an old diagnosis of Bipolar for which I can find no evidence.   She does have a diagnosis of attention deficit disorder from when she was a child.   She also has suffered two brief psychotic episodes that were the result of experimentation with powerful psychogenic drugs (LSD and some other stuff that she is unsure of).   She has been admitted to both local hospitals (OGH and WCA) 'scores' of times according to the WCA report[8] and she is well known to be a moderate risk for suicidal behavior especially when she is decompensating due to drug use.   Currently she reports that she is clean and has been clean since getting away from her boyfriend.

She tends to minimize her role in her drug usage by indicating she was trying to keep her relationship with her boyfriend at the time and that was most important to her.   She has engaged in some kind of cutting behavior since she was about 10 years old.

Currently she is taking medical leave from school because she is unable to focus and concentrate on the work that needs to be done.   She is frustrated because she has had to reteach herself to write and draw because of the damage she suffered from LSD.   She would like to try and get something to help her focus and take the edge off some of her depressive symptoms.

Tr. 399-409.

Upon examination, however, and notwithstanding Plaintiff's treatment history and subjective complaints, Ramsey observed that Plaintiff's mental status was essentially normal apart from some mild anxiety and depression.   For example, Ramsey stated:

She agreed to complete the BAI and BDI to get baseline measurements and her scores are as follows:   Anxiety: Score of 7 which indicates minimal or normal anxiety.   Depression: Score of 20 which indicates mild to moderate depression.   He BAI scores are nominal which indicate no clinically significant anxiety at this time and her BDI scores are also indicative of a level of depression that would probably respond well to

---

[8] This reference to "scores" of hospitalizations clearly appears to have been an exaggeration, as elsewhere Plaintiff acknowledged that she had only been hospitalized approximately five times. See, Tr. 649 ("She reports today five stays in psychiatric hospital.").

medication treatment.

Tr. 399-409.   Ramsey further noted that upon examination Plaintiff had a depressed mood and flat affect, as well as limited insight insofar as she blamed others for her problems, but that her mental status findings were otherwise normal, including cooperative attitude, clear speech, average eye contact, logical thought process, normal perception (no hallucinations), average intelligence, normal cognition, normal judgment, and no sign of being a danger to herself or others. Tr. 408-409.

A month later, on August 2, 2016, Plaintiff returned to Cattaraugus County Mental Health for a full psychiatric evaluation by Syed Ali Raza Shamsi, M.D. ("Shamsi"). Plaintiff indicated that her primary complaints were difficulty sleeping and difficulty "getting motivated in the mornings." Tr. 411.   Plaintiff told Dr. Shamsi that she was starting a new job at Home Depot the following day. Tr. 411.   Shamsi reported: "She states that she can concentrate fully and has been on ADHD medication since she was in elementary school. She states that she had a lack of focus and inattention, unable to concentrate when she read and unable to focus on goal-oriented activities." Tr. 411.   Upon examination, Shamsi noted the following mental status findings: Normal appearance, cooperative attitude, average eye contact, depressed mood, flat affect, clear speech, racing thoughts, normal perception, no delusions, depressive thought content, impaired attention/concentration, average intelligence, normal judgment, impaired insight (mostly blames others for problems), and no risk of self harm.   Shamsi prescribed Vyvanse "for ADHD." Tr. 413.

Plaintiff also began individual therapy with Ramsey with the primary goal of

11

addressing her depressive symptoms, and, in particular, attaining "improved mood and ability to function." Tr. 417.   Plaintiff continued in such therapy over the next several years, between 2017 and 2021, with Ramsey and, later, Jenna Golden LMSW ("Golden"), with regular medication monitoring by Monir Chaudry, M.D. ("Chaudry").   During such therapy sessions, Plaintiff indicated that she felt unable to work or to get along with people due to her mental health symptoms, *see, e.g.*, Tr. 540, but apart from occasional depression, anxiety and racing thoughts, her mental status examinations were generally normal.   The therapy records contain some references to drug-related flashbacks and delusions, but Plaintiff generally denied experiencing hallucinations or delusions.

In or about 2017, after Plaintiff claimed she had been "kicked out of her house" by her mother and had no place to live, she obtained housing through Southern Tier Environments for Living ("STEL"), first in a group home setting and later in her own apartment.[9]   The record indicates that Plaintiff sought such housing primarily for financial reasons, and not because her mental health symptoms rendered her unable to live on her own.   Indeed, progress notes made by STEL staffers indicate that Plaintiff did not feel that she needed the services offered by STEL, and that she planned to leave there and move in with her boyfriend when other housing became available through social services.[10]   The STEL records further indicate that Plaintiff came and went from the

---

[9] Tr. 567 ("Chelsea said that her mother kicked her out she had no where to go, but she would be happier living with her boyfriend.  .  .  .   Chelsea . . . said she felt that STEL was offering her an opportunity to be somewhere safe while planning to transition [to other housing through the Department of Social Services].").

[10] See, Tr. 572 ("Chelsea went on an extended home leave to her parent's home from 5/27/17-6/8/17. During this time she had apparently been making plans to move out with her boyfriend. . . .   Chelsea has been in and out of the residence (Mostly out).   She has met with staff for services, but is very unenthusiastic about doing so.   She has also told staff that the services are a waste of her time and she

STEL residence as she pleased, sometimes for extended periods,[11] and that she spent most of her time with her boyfriend or family members, as opposed to spending it with STEL staff or residents.

The record indicates that Plaintiff continued to use marijuana regularly while living at STEL.   For example, when applying to live at STEL, Plaintiff informed STEL staff that she was not interested in pursuing drug treatment at that time, at least not with respect to her marijuana usage, since she enjoyed using marijuana and planned to continue doing so, and subsequent staff notes refer to her continuing use of the drug. *See, e.g.*, Tr. 567 ("Chelsea was not happy that they wanted her to attend CARES, because Chelsea said she likes to smoke pot and has no plans to stop."); *see also*, Tr. 594 ("Chelsea has been doing well in attending all her [addiction counseling] appointments but has admitted that she still actively uses marijuana.   Chelsea has been advised by her therapist at CARES that they cannot discharge her unless she can test clean for 4 to 6 months in a row.").

When applying for services from STEL, Plaintiff indicated that her long-term plan was to return to work. Tr. 564 ("Chelsea states that she will need to get her [driver's] license and a job to be ready for discharge.   Chelsea does not feel that she is ready to

---

doesn't need our help. . . .   She spends a lot of time out with her friends or her boyfriend, Sean. Chelsea has only completed her daily chore once in the past 12 weeks. . . .   She feels that her past drug use has destroyed her brain.   She has a hard time focusing because of it."); *see also*, Tr. 575 ("Chelsea is actively seeking other housing through the Olean Housing Authority.   . . .   Chelsea noted that without [the Housing Authority's] help she wouldn't be able to afford a place and would settle for the STEL Apartment program instead."); Tr. 609 (Noting in February 2019 that a STEL employee had helped Chelsea fill out application for a public housing apartment, in which Chelsea expected to live with her boyfriend.)

[11]  Tr. 572 ("Chelsea has been in and out of the residence (Mostly out)."); Tr. 584 ("Chelsea will also go to her mother's house as well to watch the dog for her mother when she is out of town."); Tr. 604 ("Chelsea has been advising staff that she can't meet on scheduled days for she is away seeing her uncle or dad in Buffalo or staying at her mother's house.").

work at this time.").[12]   However, Plaintiff eventually claimed that she would never be able to return to work, and in December 2020, she applied for SSI benefits.

On May 14, 2021, psychologist Susan Santarpia, Ph.D. ("Santarpia") performed a psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 649-653.   Plaintiff reportedly told Santarpia that she was able to independently dress, bathe, groom herself, cook, clean, do laundry, perform shopping, manage money, and drive a car; that she socialized with family and friends; and that her hobbies were watching television, engaging in online social media activity, and drawing. Tr. 651.   Upon examining Plaintiff, Santarpia reported that Plaintiff had normal appearance and eye contact; fluent speech; coherent and goal-directed though processes with no evidence of hallucinations, delusions, or paranoia; anxious affect; anxious mood; clear sensorium; full orientation as to person, place and time; mildly impaired concentration and attention; grossly intact recent and remote memory; average-to-low-average cognitive functioning; fair insight and fair judgment. Tr. 650-651. Santarpia's medical source statement was as follows:

> Presents as able to understand, remember, and apply simple as well as complex directions and instructions, use reason and judgment to make work-related decisions, sustain concentration and perform a task at consistent pace, sustain an ordinary routine and regular attendance at work, maintain personal hygiene and appropriate attire, and be aware of normal hazards and take appropriate precautions within normal limits.   Moderate impairment is demonstrated in interacting adequately with supervisors, coworkers, and the public and [in] regulating emotion, controlling behavior, and maintaining well-being.   Difficulties are caused by chronic and consistent use of substance[s].

> The results of the present evaluation appear to be consistent with

---

[12] Plaintiff told the ALJ that she did eventually obtain her driver's license.

> psychiatric and substance abuse problems, but in of itself [sic] does not
> appear to be significant enough to interfere with the claimant's ability to
> function on a daily basis.

Tr. 652.   Santarpia further indicated that Plaintiff could manage her own funds. Tr. 652.

In or about May 2021, the Commissioner denied Plaintiff's SSI claim initially.   In connection with that determination, agency review psychologist L. Hoffman, Ph.D. ("Hoffman") reviewed the medical record and determined that Plaintiff had severe mental impairments which did not meet any listing, and that Plaintiff retained the ability to perform work on a regular and sustained basis, with some mild-to-moderate non-exertional limitations. Tr. 94.   More specifically, Hoffman found that Plaintiff was "moderately limited" in maintaining attention and concentration for extended periods, working in proximity to others, and completing a normal workday and workweek without interruption from psychologically-based symptoms.   However, Hoffman stated that, despite such limitations, Plaintiff

> is able to understand and remember simple and detailed instructions and
> work procedures without a substantial limitation.   The claimant can
> maintain adequate attention and concentration to complete work like
> procedures and sustain a routine without substantial limitation.   The
> claimant is able to relate and respond in an appropriate manner without
> substantial limitations.   Although the claimant appears to have some
> difficulty coping with stressful circumstances, there is no substantial
> limitation in her ability to manage change within a work environment.

Tr. 94.   In or about July 2021, the Commissioner denied the claim again on reconsideration. Tr. 99-118, 663-664.   In that regard, agency review psychologist E. Kamin, Ph.D. ("Kamin") concurred with Hoffman's prior determinations. *Id*.   After Plaintiff's claim was denied initially an on reconsideration, she requested a hearing before

an ALJ.

In early 2022, Plaintiff had a 5-day hospitalization for apparent drug-induced psychosis, during which she quickly recovered with medication. *See*, Tr. 752-753, 757, 767-770 (Indicating that Plaintiff was admitted to the emergency department on January 29, 2022, after presenting with unspecified psychosis in conjunction with daily marijuana usage, having last smoked marijuana 30 minutes prior to going to the emergency department, and was quickly stabilized with medication.   By January 31, 2022, Plaintiff's delusions had "resolved" and she reported feeling "a lot better." Tr. 919).   When Plaintiff presented for this encounter, she reportedly claimed that she had "a history of schizophrenia" and "heard voices," and that in particular she heard voices telling her to chop off her arm. Tr. 752.   Plaintiff indicated that she was scared by the voices, but that she would "never act upon" what they were telling her. Tr. 752.   The following day, Plaintiff reported that her "delusions had resolved" with medication, Tr. 767, 775, and her mental status examination was completely normal. Tr. 768.   Plaintiff was discharged and advised of the importance of taking her prescribed medications and of avoiding "any alcohol and drugs." Tr. 775.

Shortly after this incident, on March 7, 2022, therapist Bernadette Holyoke ("Holyoke") of Cattaraugus County Mental Health completed a 2-page check-the-box functional assessment for Plaintiff. Tr. 865-866.   The form indicated, in pertinent part, that Plaintiff had "extended impairment in functioning due to mental illness[es]," including ADHD, borderline personality disorder, PTSD, and "cannabis abuse with psychotic disorder with delusions." Tr. 866.   The form further stated that Plaintiff's impairments

16

resulted in "marked difficulties in self-care," "marked restriction of activities," "marked difficulties in maintaining social functioning," "frequent deficiencies of concentration, persistence or pace," and "reliance on psychiatric treatment, rehabilitation and supports." Tr. 865.   The form further indicated that Plaintiff needed "assistance in maintaining personal hygiene," did "not willingly participate in social or recreational activities," needed "assistance in developing and maintaining social and recreational activities," needed "assistance in taking initiative," and lacked "stability & proper support groups." Tr. 866. The form did not indicate the basis for Holyoke's opinions, nor did it expressly indicate whether Holyoke had personally examined Plaintiff.[13]

On April 29, 2022, Holyoke, completed a further functional assessment report at the request of Plaintiff's attorney. Tr. 942-947.   Holyoke indicated that Plaintiff's diagnosis was "schizoaffective disorder," and that Plaintiff was taking medications consisting of Geodon, Lexapro, Topamax, and Ativan. Tr. 942.   When asked to identify Plaintiff's signs and symptoms, Holyoke checked most of the possible boxes, including those for "thoughts of suicide," "blunt or flat affect," "impairment in impulse control," "generalized persistent anxiety," "mood disturbance," "difficulty thinking or concentrating," "recurring intrusive thoughts," "change in personality," "apprehensive expectation," "paranoid thinking or inappropriate suspiciousness," "recurrent obsessions or compulsions," "incoherence," "emotional withdrawal or isolation," "bipolar syndrome,"

---

[13]  In this regard, and as previously noted, Plaintiff's treatment at Cattaraugus County had primarily been with Ramsey and Golden, and the Court does not recall seeing any prior notes from therapy sessions with Holyoke.   Moreover, Plaintiff testified at the hearing that she did not begin seeing Holyoke until approximately early 2022, shortly before the hearing.   In other words, Holyoke wrote this report at approximately the same time that she began seeing Plaintiff for treatment.

"intense and unstable personal relationships," "perceptual and thinking disturbances," "hallucinations or delusions," "emotional lability," "flight of ideas," "manic syndrome," "inflated self-esteem," "loosening of associations," "illogical thinking," "memory impairment," "sleep disturbance," and "oddities of thought, perception, speech or behavior." Tr. 943.   One of the only boxes that Holyoke did *not* check was the box for "substance dependence." *Id*.    In a later section of the form entitled "mental abilities and aptitudes to do unskilled work," Holyoke checked boxes indicating that Plaintiff had "no useful ability to function" in any of sixteen listed categories. Tr. 944.   Similarly, in sections entitled "mental abilities and aptitudes to do semiskilled and skilled work" and "mental abilities and aptitude needed to do particular types of jobs," Holyoke again indicated that Plaintiff had "no useful ability to function" in any of the categories. Tr. 945.   Holyoke added: "Chelsea suffers from persistent + disturbing delusions + hallucinations – vacillating from wanting to self harm/disfigure herself to believing she is [a] divine being sent here on a mission." Tr. 945.    Holyoke further indicate that Plaintiff would be absent from work "more than four days per month."   Holyoke also asserted that Plaintiff was incapable of managing her own funds. Tr. 947. Finally, when asked to state whether, if Plaintiff's "impairments include[d] alcohol or substance" abuse, such "alcohol or substance abuse contribute[d] to any of [Plaintiff's] limitations," Holyoke checked "no." Tr. 947.[14]

On May 12, 2022, a hearing was held before an ALJ, at which Plaintiff, represented

---

[14]  As mentioned earlier, in Holyoke's first functional report, dated March 7, 2022, she had indicated that one of Plaintiff's diagnoses was "cannabis abuse with psychotic disorder with delusions." Tr. 866.

by counsel, and a VE testified.   On September 23, 2022, the ALJ issued a decision

finding that Plaintiff was not disabled at any relevant time.[15]   Very briefly, the ALJ found

that Plaintiff had various impairments that did not meet or equal a listed impairment; that

Plaintiff had the RFC to perform less than a full range of work at all exertional levels; and

that with such RFC Plaintiff could not perform her past relevant work, but could perform

other work.

Since Plaintiff's subject motion is concerned with the ALJ's RFC finding, the Court

will focus on that aspect of the ALJ's decision.[16]   Specifically, the ALJ's decision stated

in pertinent part:

> After careful consideration of the entire record, I find that the claimant has
> the residual functional capacity to perform a full range of work at all
> exertional levels but with the following non-exertional limitations: She can
> carry out simple and short instructions for about two-hour periods after
> which she must be allowed a 10- to 15-minute break to complete an 8-hour
> workday. She can occasionally interact with supervisors and coworkers, but
> she cannot work in tandem with them. She can superficially interact with the
> general public. She can respond to changes in the work setting that occur
> no more than occasionally.

Tr. 29.

In explaining how she arrived at the finding that Plaintiff was able to remain on task

for two-hour periods, followed by fifteen-minute breaks, the ALJ stated, in her discussion

---

[15] *See*, Plaintiff's Memo of Law, ECF No. 7 at pp. 1-2 ("On May 12, 2022, Administrative Law Judge
("ALJ") Linda Crovella held a video hearing at which Plaintiff appeared via videoconference with her
attorney and testified. T. 43-79. A vocational expert also testified. Id. The ALJ issued an unfavorable
decision on September 23, 2022. T. 21-42. Plaintiff timely appealed the ALJ's decision to the Appeals
Council and on July 18, 2023, the Appeals Council denied Plaintiff's request for review. T. 1-6.").
.

[16] Defendant maintains, and the Court agrees, that Plaintiff's motion does not challenge the ALJ's
determinations at the first three steps of the five-step sequential evaluation.

at step three of the five-step sequential evaluation:

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. Though the claimant reported needing help cleaning her apartment and that she needs reminders to shower, she also has lived alone for more than three years and has otherwise reported that she can prepare simple meals, clean, shop for groceries once a month, drive, do art, use her phone to talk to friends, watch TV, and listen to music (Exhibit B3E; Exhibit B15E; Exhibit B8F, page 4; Exhibit B9F, page 3; hearing testimony). Additionally, though she reported difficulty paying attention, her attention and concentration has been normal or, at most, mildly impaired during examinations (*See, e.g.*, Exhibit B3E, pages 2, 4; Exhibit B15E, page 6; Exhibit B8F, page 4; Exhibit B15F, page 30). Therefore, the evidence is consistent with moderate, but not marked, limitations in this area of functioning. Accordingly, I have limited the claimant to simple and short instructions for about two-hour periods after which she must be allowed a 10- to 15-minute break to complete the workday; occasional interactions with supervisors and coworkers but no tandem work; superficial interaction with the general public; and only occasional changes in the work setting.

Tr. 28.   Later in the ALJ's decision, when explaining her RFC finding, the ALJ further

stated, in pertinent part:

> The claimant does have a long history of mental health-related diagnoses (*See, e.g.*, Exhibits B1F, B2F, B3F, B4F), which have also been discussed in the "paragraph B" analysis in Finding 3, above. The evidence confirms that her impairments have continued to be severe during the period at issue. However, despite her brief hospitalization in January 2022 and reports of ongoing mental health symptoms, the claimant has generally been managed fairly well for her conditions with only routine outpatient mental health treatment. Accordingly, while I have limited the claimant to simple and short instructions for about two-hour periods after which she must be allowed a 10- to 15-minute break to complete the workday[,] . . . the evidence simply does not support greater limitations.
>
> For example, during the period at issue, the claimant has received medications from Cattaraugus County Mental Health, with evaluations

every three months or so. In August 2020, shortly before the protective filing date, the claimant reported some depression and motivation level that was "a bit low," even after medication adjustments in April 2020. However, she also stated that she was sleeping well with stable appetite and no suicidal ideations, homicidal ideations, hallucinations, or other concerns. No abnormal mental status findings were noted. (Exhibit B4F, pages 138-140).

***

In October 2020, it was noted that the claimant had made fair progress, despite poor attendance with treatment at times (Exhibit B4F, page 143).

***

In a Function Report completed in March 2021, the claimant reported anxiety a few times a week lasting an hour or more but that she can function afterwards (Exhibit B4E, page 1). During her psychiatric follow-up in late March 2021, the claimant reported that she was stable and doing fine from a psychiatric standpoint on her medications, including with sleep, appetite, mood, and hallucinations. Mental status findings during that visit were normal (Exhibit B14F, pages 64, 66).

***

When the claimant returned to Cattaraugus County Mental Health in July 2021, she reported difficulties with visual hallucinations, anxiety, nightmares, and thoughts of self-harm. Her medications were adjusted. However, despite her complaints of ongoing symptoms and anxious mood on examination, the remainder of the mental status findings were normal (Exhibit B17F, page 3).

***

In early January 2022, the claimant reported improved anxiety, stable appetite and sleep, no suicidal ideations, and no hallucinations, though she also alleged ongoing anxiety with skin picking, impulsiveness, and nightmares. Her medications were once again adjusted. However, despite her complaints and depressed/anxious mood and flat affect, the claimant also had otherwise normal mental status findings (Exhibit B17F, pages 12-13).

***

The claimant was admitted to Olean General Hospital on January 29, 2022, for a "schizophrenic episode" with auditory hallucinations, severe delusions, and increased life stressors reported by the claimant. At admission, she was alert and oriented times four, but had psychoses (Exhibit B15F, pages 16, 20; Exhibit B18F, pages 22, 40). By January 31, 2022, and February 1,

2022, she endorsed that she was feeling "much better" with improved mood and lessened "chaos in her brain."   . . . She was discharged to home on February 3, 2022[.]

\*\*\*

At her post-hospitalization discharge follow-up at Cattaraugus County on February 11, 2022, the claimant was anxious and depressed with flat affect, and delusions, and circumstantial thought process. However, examination also revealed that she was cooperative with normal perception, no hallucinations, normal thought content, normal cognition, and normal insight and judgment.

\*\*\*

In April 2022, the claimant reported ongoing symptoms of hypomania, low energy and mood, and desires to cut herself. She reported stressors about her SSI hearing, living situation, and money and stated that she "cannot work, cannot be around people." She reported drug induced psychoses and periods of feeling like a God or oracle. Despite these complaints and symptoms on presentation, however, the mental status examination also revealed cooperative attitude, normal thought content, normal cognition, average intelligence, normal insight, and normal judgment. (Exhibit B19F, pages 3-4).

\*\*\*

On May 14, 2021, consultative examiner Susan Santarpia, PhD, opined that the claimant "Presents as <u>able to understand, remember, and apply simple as well as complex directions and instructions, use reason and judgment to make work-related decisions, sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work</u>, maintain personal hygiene and appropriate attire, and be aware of normal hazards and take appropriate precautions within normal limits. Moderate impairment is demonstrated in interacting adequately with supervisors, coworkers, and the public and regulating emotion, controlling behavior, and maintaining well-being. Difficulties are caused by chronic and consistent use of substance" (Exhibit B8F, pages 4-5). This opinion is only partially persuasive because, while Dr. Santarpia supported her findings with her examination of the claimant and program knowledge, her finding regarding the substance use is not fully consistent with the evidence as a whole. For example, while I find that the substance use disorder is severe, I do not find it to be material to the finding of disability, particularly because the evidence does not clearly delineate the line between the ongoing symptoms and

periods of use or abstinence. Rather, I rely more on the evidence that reveals that, <u>despite ongoing symptoms and somewhat inconsistent conservative mental health treatment, the claimant has had only one brief psychiatric hospitalization during the period at issue and many normal mental status findings</u> (See, e.g., Exhibit B3E, page 6; Exhibit B9E, page 6; Exhibit B15E, page 7; Exhibit B4F, pages 140, 143; Exhibit B8F, page 4; Exhibit B14F, pages 66-67; Exhibit B15F, page 30; Exhibit B17F, pages 3, 8, 24). This evidence is also more consistent with the "paragraph B" findings by Drs. Hoffman and Kamin, though I have found mild limitations in the area of understanding, remembering, or applying information. Accordingly, I have limited the claimant to simple and short instructions for about two-hour periods after which she must be allowed a 10- to 15-minute break to complete the workday; occasional interactions with supervisors and co-workers but no tandem work; superficial interaction with the general public; and only occasional changes in the work setting, the evidence simply does not support greater limitations.

***

On May 20, 2021, state agency reviewing psychiatric consultant L. Hoffman, PhD, opined that the claimant's impairments do not meet or equal any Listings and that she has no limitations in the "paragraph B" area of understanding, remembering, or applying information and moderate limitations in the remaining three areas of functioning. They also opined that the claimant is able to understand and remember simple and detailed instructions and work procedures without a substantial limitation. The claimant can maintain adequate attention and concentration to complete work like procedures and can sustain a routine without substantial limitation. The claimant is able to relate and respond in an appropriate manner without substantial limitations.   Although the claimant appears to have some difficulty coping with stressful circumstances, there is no substantial limitation in her ability to manage change within a work environment. (Exhibit B1A, page 8; Exhibit B6F; Exhibit B11F). E. Kamin, PhD, affirmed these findings on July 1, 2021 (Exhibit B3A, page 9; Exhibit B12F). These opinions are only partially persuasive because, while the diagnoses, lack of Listing-level impairments, and "B" limitations are all supported by their respective reviews of the record and program knowledge and are all generally consistent with the record as whole (*See, e.g.*, Exhibit B3E, page 6; Exhibit B9E, page 6; Exhibit B15E, page 7; Exhibit B4F, pages 140, 143; Exhibit B8F, page 4; Exhibit B14F, pages 66-67; Exhibit B15F, page 30;

23

Exhibit B17F, pages 3, 8, 24), the related "moderate" residual functional capacity findings are less [so] because, first, "moderate" is not a functionally specific term and the record is certainly consistent with some, but not disabling, limitations with interacting with others and certain work stressors. Accordingly, having relied more on the objective evidence, I have limited the claimant to simple and short instructions for about two hour periods after which she must be allowed a 10- to 15-minute break to complete the workday; occasional interactions with supervisors and co-workers but no tandem work; superficial interaction with the general public and only occasional changes in the work setting, the evidence simply does not support greater limitations.

Tr. 29-34.   In sum, despite Plaintiff's statements about her symptoms, the ALJ found the opinions of Doctors Santarpia, Hoffman, and Kamin, to be generally persuasive evidence that Plaintiff could perform the mental requirements of work on a regular and sustained basis, inasmuch as they were consistent with the treatment record as a whole, which, the ALJ found, showed mainly conservative treatment and normal mental status examinations throughout the relevant period.

On the other hand, in making the RFC finding, the ALJ found the opinions by therapist Holyoke, that Plaintiff essentially lacked any mental ability whatsoever to work, to be unpersuasive, stating:

In a March 7, 2022, check-the-box SPMI form, Bernadette Holyoke, MSEd, indicated that the claimant had a designated mental illness, extended impairment in functioning in all areas, and reliance on psychiatric treatment. In the "Functional Assessment" portion of the form, she indicated that the claimant needs assistance with maintaining personal hygiene; needs assistance, learning about and maintaining proper nutrition; does not willingly participate in social or recreational activities; needs assistance in forming contacts with potential friends or interacting with strangers; needs assistance in development and maintaining social and recreational activities; needs assistance in taking initiative seeking others for assistance

24

with problems; and lacks stability and proper support groups in environments which enforce clear thinking and concentration (Exhibit B17F, pages 32-33). On April 29, 2022, Ms. Holyoke completed a mental medical source statement at the request of the claimant's attorney. She indicated that she had treated the claimant "on and off" for multiple years for a diagnosis of schizoaffective disorder. [17]   She indicated symptoms of thoughts of suicide; Blunt, flat, or inappropriate affect; Impairment in impulse control; Generalized persistent anxiety; Mood disturbance; Difficulty thinking or concentrating; Recurrent and intrusive recollections of a traumatic experience, which are source of marked distress; Pathological dependence, passivity, or aggressivity; Persistent disturbance of mood or affect; Change in personality; Apprehensive expectation; Paranoid thinking inappropriate suspiciousness; Recurrent obsessions or compulsions which are source of marked distress; Incoherence; Emotional withdrawal or isolation; Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); Intense and unstable interpersonal relationships and impulsive and damaging behavior; Perceptual or thinking disturbances; Hallucinations or delusions; Emotional lability; Flight of ideas; Manic syndrome; Inflated self-esteem; Loosening of associations; Illogical thinking; Memory impairment; Sleep disturbance; and Oddities of thought, perception, speech, or behavior. <u>She indicated that the claimant would have no useful ability to perform any of the mental abilities necessary for unskilled work.</u> Ms. Holyoke wrote that "Chelsea suffers from persistent and disturbing delusions and hallucinations - vacillating from wanting to self-harm/ disfigure herself to believing she is divine being sent here on a mission. <u>She indicated that the claimant would be absent more than four days per month.</u> Ms. Holyoke indicated that alcohol or substance abuse do not contribute to any of these limitations (Exhibit B20F). I have considered Ms. Holyoke's opinions both singly and in combination with each other and find them both to be unpersuasive.

First, as per the Social Security Administration's new policy, statements on issues reserved to the Commissioner or for other governmental agencies are inherently neither valuable nor persuasive, and no written analysis on how this evidence is considered is necessary. Second, even <u>the more</u>

---

[17]  Again, despite what Holyoke wrote, Holyoke did not personally treat Plaintiff during most of this period, since Plaintiff testified at the hearing that she had only begun seeing Holyoke a few months earlier.

> functionally specific findings are not supported by any explanation from Ms. Holyoke beyond just a check-the-box, nor are they fully consistent with the claimant's general response to only routine and conservative mental health treatment during much of the period at issue (See, e.g., Exhibit B3E, page 6; Exhibit B9E, page 6; Exhibit B15E, page 7; Exhibit B4F, pages 140, 143; Exhibit B8F, page 4; Exhibit B14F, pages 66-67; Exhibit B15F, page 30; Exhibit B17F, pages 3, 8, 24). I also note that the first form was completed shortly after the claimant's release from the hospital in February 2022, but, by April 2022, the claimant had many normal mental status findings that are not consistent with Ms. Holyoke's forms (Exhibit B19F, pages 3-4).
>
> Accordingly, having found the "paragraph B" limitations of Drs. Hoffman and Kamin to be more persuasive, I have limited the claimant to simple and short instructions for about two-hour periods after which she must be allowed a 10- to 15-minute break to complete the workday; occasional interactions with supervisors and co-workers but no tandem work; superficial interaction with the general public; and only occasional changes in the work setting, the evidence simply does not support greater limitations.

Tr. 33-34 (emphasis added).   In short, the ALJ found Holyoke's opinions to be unpersuasive insofar as they were variously unexplained, rendered at time when Plaintiff was experiencing an exacerbation of symptoms, and generally inconsistent with the treatment record showing that Plaintiff frequently had normal mental status findings.

On September 6, 2023, Plaintiff commenced this action, and on December 6, 2023, she filed the subject motion for judgment on the pleadings, alleging that the ALJ erred in the following respects: "I. The ALJ erred where she failed to provide a medical basis for the specific off task limitation included in the RFC finding[,]" and "II. The ALJ failed to properly evaluate the disability-supporting opinions of Plaintiff's therapist, Bernadette Holyoke, MSEd." ECF No. 7-1 at p. 1.   More specifically, concerning these alleged errors by the ALJ, Plaintiff states:

> [T]he ALJ failed to demonstrate that the limitation for a 10-15 minute break after two hours of continuous work was based on evidence in the record, and not her own surmise. The ALJ further erred when she rejected the disability-supporting opinions of Plaintiff's therapist Bernadette Holyoke without acknowledging evidence that supported the opinions. Accordingly, Plaintiff requests remand for proper consideration of the evidence and an RFC finding that is supported by evidence of record instead of the ALJ's own lay judgment.

ECF No. 7-1 at p. 11 (emphasis added).

With regard to the first of these alleged errors, Plaintiff contends that the ALJ's finding, that Plaintiff could work continuously for two-hour blocks of time followed by fifteen-minute breaks, was a "very specific" finding concerning Plaintiff's ability to remain on task that had to be supported by evidence. *See*, Pl. Memo of Law, ECF No. 7-1 at p. 11 ("It is well-settled that very specific RFC assessments, such as the amount of time that a claimant can be off task, must be based on evidence in the record and not on '"the ALJ's own surmise.' *Cosnyka v. Colvin*, 576 Fed.Appx. 43, 46 (2d Cir. 2014)") (and collecting cases).   Plaintiff maintains that the ALJ ran afoul of this rule, since "the ALJ provided no medical basis for choosing that particular amount of time." ECF No. 7-1 at p. 13.   Plaintiff further contends that this alleged error by the ALJ was not harmless, since the VE testified that if a claimant needed *unscheduled* breaks for 10-15 minutes, *in addition to regularly scheduled breaks*, the claimant would not be employable. *Id*. at p. 13. (emphasis added).

With regard to the second alleged error by the ALJ, Plaintiff asserts that that the ALJ failed to properly consider the supportability and consistency of Holyoke's opinion based on all the evidence, and instead selectively "cherry picked" evidence that undermined Holyoke's opinion.   For example, Plaintiff states:

27

Ms. Holyoke opined that stress tolerance was an issue for Plaintiff, and that Plaintiff found speed, precision, complexity, deadlines, working within a schedule, making decisions, exercising independent judgment, completing tasks, working with other people, dealing with the public, dealing with supervisors, being criticized by supervisors, getting to work regularly, remaining at work for a full day, and fear of failure at work to be stressful. T. 946. Ms. Holyoke further opined that Plaintiff would likely be absent from work more than four days per month. Id.

The ALJ rejected Ms. Holyoke's opinion, reasoning that it was "not supported by any explanation from Ms. Holyoke beyond just a check-the-box, nor are they fully consistent with the claimant's general response to only routine and conservative mental health treatment during much of the period at issue." T. 35 (emphasis added). The ALJ's characterization of Plaintiff's mental health treatment as "routine and conservative" is plainly inaccurate. Aside from Plaintiff's psychiatric hospitalization in January and February of 2022, the record demonstrates that her medications were continuously adjusted throughout the relevant period due to persistent symptoms of anxiety, delusions, suicidal ideation, and hallucinations. See, e.g., T. 834-35; 843-44; 855-57; 936-37; 959-60.

The ALJ's mischaracterization of Plaintiff's mental health treatment to justify rejecting the disability-supporting opinion of Ms. Holyoke is further grounds for remand.

ECF No. 7-1 at pp. 16-17 (emphasis added).

Defendant Commissioner disagrees and insists that the ALJ's decision is free from error and supported by substantial evidence.   More specifically, Defendant summarizes his argument by stating:

Substantial evidence supports the administrative law judge's (ALJ's) residual functional capacity (RFC) finding, including Plaintiff's normal mental status examination findings on many occasions, as well as opinion evidence from multiple medical sources who found that Plaintiff remained capable of performing simple and routine tasks on a regular and continuing basis.

There is no merit to Plaintiff's assertion that the ALJ erred by finding that she could work in two-hour increments followed by a 10 to 15 minute break. The ALJ was simply explaining that Plaintiff remained capable of performing unskilled work as contemplated by a normal work schedule, which includes breaks at two-hour increments: a morning break, a lunch break, and an afternoon break. In fact, the vocational expert confirmed that such breaks were general employment breaks in the context of the jobs identified by the ALJ. And the ALJ's RFC finding is supported by the medical opinion and other evidence, including the opinion evidence finding that Plaintiff could perform simple work without substantial limitation in keeping a routine.

Also unavailing is Plaintiff's argument that the ALJ did not properly assess an opinion from counselor Bernadette Holyoke, one of her own sources. The ALJ reasonably pointed out that Ms. Holyoke did not sufficiently support her opinion with explanation and that the opinion was inconsistent with Plaintiff's largely conservative treatment history and generally normal mental status examination findings. In arguing to the contrary, Plaintiff merely offers her preferred interpretation of the evidence surrounding Ms. Holyoke's opinion, but that is insufficient under the substantial evidence standard of review. Plaintiff instead has not shown that the ALJ acted unreasonably in assessing the evidence before her. Because substantial evidence supports the ALJ's decision and it is free from legal error, this Court should affirm.

ECF No. 9-1 at pp. 2-3 (emphasis added).

The Court has considered the parties' submissions, including Plaintiff's reply, and the entire administrative record.

## DISCUSSION

<u>The ALJ's Finding Concerning Plaintiff's Ability to Work for Two-Hour Periods, Separated by Fifteen-Minute Breaks, is Supported by Substantial Evidence, and is Not Based Merely on the ALJ's Surmise</u>

Plaintiff contends that the ALJ committed a legal error, in violation of the Second

Circuit's decision in *Cosnyka v. Colvin*, by making a "very specific" finding concerning the amount of time that Plaintiff could remain on task, based on nothing more than her own surmise.   Plaintiff further contends that this finding by the ALJ was not harmless, since the VE testified that if a claimant needed unscheduled breaks for 10-15 minutes, in addition to regularly scheduled breaks, the claimant would not be employable. Defendant responds that Plaintiff's argument is mistaken, since the ALJ never indicated that Plaintiff needed *unscheduled* fifteen minute breaks *in addition to* the regular fifteen minute breaks in the morning and afternoon.   Defendant points out, rather, that the ALJ indicated that Plaintiff could stay on task for regularly scheduled two-hour blocks of time, followed by the normal, regularly scheduled fifteen-minute breaks afforded to most employees.   On this point, Defendant notes that during the hearing, the VE testified that the arrangement indicated by the ALJ in her RFC, *i.e.*, two hour blocks of work followed by fifteen minute breaks, was the standard arrangement for unskilled jobs.

The Court agrees with Defendant that the ALJ's RFC finding, concerning Plaintiff's ability to work for two-hour blocks of time followed by fifteen minute breaks, did not run afoul of *Cosnyka* and is supported by substantial evidence.   Preliminarily, Plaintiff is mistaken in suggesting that the ALJ found that Plaintiff needed additional, unscheduled breaks in addition to the standard fifteen-minute breaks afforded to unskilled workers. Such an arrangement is simply not part of the ALJ's RFC finding.   The Court also agrees with Defendant that the arrangement described by the ALJ -- two hour blocks of work followed by fifteen minute breaks—is not some highly-specific finding peculiar to Plaintiff, but, rather, is the standard arrangement for unskilled work. This point is supported by

testimony of the VE, which he gave in response to the hypothetical question that formed the basis for the ALJ's RFC finding:

> ALJ: If we assume an individual the same age, education, and work experience as the Claimant who can carry out short and simple instructions for about two-hour periods after which she must be allowed a ten- to 15-minute break to complete an eight-hour workday.   And she can occasionally interact with supervisors and co-workers, but she cannot work in tandem with them.   She can superficially interact with the general public in the performance of her duties.   And she can respond to changes in the work setting that occur no more than occasionally.   Are there jobs that such an individual could perform.
>
> VE: Yes, Your Honor.   . . .   And I will note for the record that break periods, contact with others, tandem tasks, changes in the work setting, those topics are not defined in the DOT.   And my testimony will be based on my professional experience, training and knowledge.   <u>I would also note for the record that there are two scheduled breaks, 15 minutes in duration.   One in the morning and one in the afternoon.   And a lunch period ranging from a half-hour to an hour.   And those are all generally scheduled by the employer</u>.   First occupational group would be sorter, representative DOT 569.687-022, national number of 94,000.   In addition, order filler, 209.587-034, national number of 129,000.   And, finally, record clerk, 241.367-038, national number of 10,000.

Tr. 75 (emphasis added).

Consequently, the Court finds no merit to Plaintiff's argument that the challenged aspect of the RFC finding, concerning breaks every two hours,[18] was merely the product of the ALJ's surmise.   Under similar circumstances, another Judge in this District recently rejected the same argument by a claimant, stating:

> Plaintiff argues that support for the ALJ's determination regarding breaks is

---

[18]  *See*, ALJ's Decision ("She can carry out simple and short instructions for about two-hour periods after which she must be allowed a 10- to 15-minute break to complete an 8-hour workday.").

not found in the administrative record before the ALJ. Specifically, he contends that none of the medical providers offering opinions opined as to the length of time Plaintiff would need to be off-task. (Dkt. 9 at 27 ("None of these examining or reviewing medical sources expressed any opinion whatsoever concerning the length of time plaintiff would likely be off task or absent as a result of medically determinable impairments.")). He contends therefore that the RFC requirement for breaks at 2-hour intervals was a creation of the ALJ's layperson determination based on cherry-picked evidence.

Contrary to Plaintiff's argument, two of the opinions found persuasive by the ALJ, state agency physicians Dr. Bruni and Dr. Fassler, opined that Plaintiff could perform light work with "normal breaks." And the breaks set forth by the ALJ in the RFC do not stray from what are considered normal breaks for unskilled work. *See Darcy v. Comm'r of Soc. Sec.*, No. 20-CV-4769 (JMA), 2023 WL 2035945, at *8 (E.D.N.Y. Feb. 16, 2023) ("This '2-hour intervals' limitation simply describes 'the customary breaks allowed in unskilled employment.... Normal work breaks and meal periods split an eight hour workday into approximately two hour periods.") (quotation marks, quotations, and citations omitted)); *Ra'Jour B. v. Comm'r of Soc. Sec.*, No. 1:21-CV-868-DB, 2023 WL 5959193, at *10 (W.D.N.Y. Sept. 12, 2023) (requirement of one to two bathroom breaks "falls within the definition of normal breaks for most jobs" (citing Social Security Administration Program Operations Manual System ("POMS") DI 25020.010B(2)(a) (describing a normal job as having two breaks in addition to lunch))); *Brink v. Colvin*, No. 1:14-CV-00940 (MAT), 2017 WL 2531711, at *2 (W.D.N.Y. June 12, 2017) ("Normal work breaks and meal periods split an eight hour workday into approximately two hour periods."); *Morales v. Comm'r of Soc. Sec.*, No. 10 CIV. 8773 BSJ KNF, 2012 WL 124554, at *18 (S.D.N.Y. Jan. 17, 2012) ("[T]he Social Security Administration's policy, [ ] provides that one of the mental abilities needed for any job is the 'ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure).' " citing POMS DI 25020.010)), *report and recommendation adopted*, 2012 WL 4793868 (S.D.N.Y. Oct. 9, 2012).

*Daniel F. v. Comm'r of Soc. Sec.*, No. 1:22-CV-00292 EAW, 2023 WL 6304722, at *9

(W.D.N.Y. Sept. 28, 2023).

Similarly, in the instant case, the ALJ's finding that Plaintiff could maintain attention and concentration for two-hour periods, followed by 10- to 15-minute breaks, that is, perform a normal work schedule, was supported by the opinions of Doctors Santarpia, Hoffman, and Kamin. *See, e.g.*, opinion of Dr. Santarpia, Tr. 651-652 ("MEDICAL SOURCE STATEMENT: Presents as able to . . . sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work[.]"); *see also*, opinion of Dr. Hoffman, Tr. 94 ("The claimant can maintain adequate attention and concentration to complete work like procedures and can sustain a routine without substantial limitation.').   Consequently, this aspect of Plaintiff's motion is denied.

> <u>The ALJ's Finding Regarding the Supportability and Consistency</u>
> <u>Of Holyoke's Opinion is Supported by Substantial Evidence and is</u>
> <u>Not the Product of Legal Error</u>

Plaintiff next maintains that the ALJ erred when evaluating the opinion of therapist Holyoke, since she "mischaracterized" the evidence by stating that Holyoke's opinions were not "fully consistent with the claimant's general response to only routine and conservative mental health treatment during much of the period at issue."[19]   Plaintiff maintains that this was a mischaracterization, since Plaintiff's mental health treatment was not actually "routine and conservative," since, for example, her medications were "continuously adjusted" during the relevant period. *See*, Plaintiff's Memo of Law, ECF No. 7-1 at p. 11 ("The ALJ further erred when she rejected the disability-supporting opinions

---

[19] ALJ's Decision, Tr. 35.

of Plaintiff's therapist Bernadette Holyoke without acknowledging evidence that supported the opinions."); *see also, id.* at pp. 16-17 ("The ALJ's characterization of Plaintiff's mental health treatment as "routine and conservative" is plainly inaccurate. Aside from Plaintiff's psychiatric hospitalization in January and February of 2022, the record demonstrates that her medications were continuously adjusted throughout the relevant period due to persistent symptoms of anxiety, delusions, suicidal ideation, and hallucinations.").

However, the Court also finds no merit to this argument.    Of course, it is true that where an ALJ makes an RFC finding that conflicts with a medical opinion, the ALJ must explain why the conflicting opinion was not adopted, and that in doing so the ALJ cannot mischaracterize the evidence or cherry-pick only the evidence as supports the ALJ's determination while ignoring contrary evidence. *See*, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. *If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (emphasis added).

> Generally, an ALJ must reconcile discrepancies between his or her RFC assessment and medical source statements. SSR 96-8p, 1996 WL 374184, at *7; *see Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). "If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ 'must explain why the opinion was not adopted.'" *Williams v. Colvin*, No. 13-roncv-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (quoting SSR 96-8p); *accord Garcia v. Berryhill*, No. 17-cv-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018). While an "ALJ is not required to explicitly reconcile every conflicting shred of evidence in the record, an ALJ cannot simply selectively choose evidence in the record that supports [his] conclusions." *Williams*, 2015 WL 1223789, at *8 (cleaned up); *see also Balsamo v. Chater*, 142 F.3d 75, 81

(2d Cir. 1998) (an ALJ may not "arbitrarily substitute his own judgment for competent medical opinion").

*Lynch v. Commissioner*, No. 22CIV5620CSAEK, 2024 WL 728483, at *11 (S.D.N.Y. Feb. 21, 2024); *see also, Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644 (2d Cir. 2020) ("The ALJ is obligated to consider "'all of the relevant medical and other evidence.'" *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1545(a)(3)). An ALJ's failure to consider relevant evidence is grounds for remand. *See id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (concluding that ALJ erred by tending to "overlook or mischaracterize" portions of evidence that supported disability finding)."); *Vanessa N. v. Comm'r of Soc. Sec.*, No. 1:23-CV-00913 EAW, 2024 WL 4131242, at *3 (W.D.N.Y. Sept. 9, 2024) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

Here, however, the Court does not agree with Plaintiff that the ALJ mischaracterized the record by asserting that Holyoke's opinion was not "fully consistent with the claimant's general response to only routine and conservative mental health treatment during much of the period at issue."[20]  That is, the Court finds, first, that it was not a mischaracterization to describe Plaintiff's mental health treatment during the relevant period as mostly "routine and conservative."  Contrary to what Plaintiff argues, the fact that Plaintiff's medications may have been adjusted at various times during the relevant period does not necessarily establish that her treatment was other than routine

---

[20] ALJ's Decision, Tr. 35.

and conservative.

Nor was it a mischaracterization of the evidence for the ALJ to state that Holyoke's opinions were unsupported, or that they were inconsistent with the treatment record "during much of the period at issue."   In that regard, Holyoke's opinions were indeed unsupported, since Holyoke never explained how she arrived at them.   Holyoke's second report implied that her opinions were based on her personally having treated Plaintiff "on and off for multiple years," but that assertion, while perhaps true of Cattaraugus Mental Health in general, was clearly not true of Holyoke.   Rather, Plaintiff's hearing testimony demonstrated that she never met with Holyoke until early 2022, shortly after her January 2022 hospitalization and just prior to the administrative hearing.   Moreover, neither of Holyoke's reports explain how she arrived at the checked-box findings she listed. Indeed, Holyoke's second report left blank the space in which she was asked to "describe the clinical findings" that demonstrated the severity of Plaintiff "mental impairment and symptoms." Tr. 942.

Nor are there office notes by Holyoke containing findings to support most of her opinions.   Rather, to the Court's recollection, there is a single, brief treatment note, dated February 11, 2022, from a session between Plaintiff and Holyoke that was apparently conducted by telephone, approximately ten days after Plaintiff was discharged from the hospital after she was treated for her psychotic episode. Tr. 855-858.   Plaintiff reportedly told Holyoke that she had gone to the hospital because she was suicidal, and because a demon had told her to kill herself. Tr. 855.   Plaintiff also indicated that she had believed at the time that she was Anne Frank.   Holyoke listed Plaintiff's diagnoses as being

36

ADHD, PTSD, "substance induced psychotic disorder," "tobacco use disorder," "other psychoactive substance dependence, in remission," and "cannabis abuse with psychotic disorder with delusions." Tr. 855.   However, the only mental status findings reported by Holyoke were cooperative attitude; depressed and anxious mood; flat affect; clear speech; circumstantial thought process; normal perception (no hallucinations);[21] normal thought content; normal cognition; no reported or observed risk of danger to self or others; average intelligence; normal insight; and normal judgment. Tr. 858.

Holyoke's opinions were also inconsistent with much of the treatment record "during much of the period at issue," as the ALJ found.   For example, Holyoke's curious assertion, in her second opinion, that Plaintiff, a well-documented abuser of hard drugs and a daily marijuana smoker, did not exhibit "substance dependence," Tr. 943, and that substance abuse played no role in her functional limitations, Tr. 947, is clearly inconsistent with most of the treatment records, and is also seemingly inconsistent with Holyoke's first functional report, written one month earlier, in which she acknowledged that one of Plaintiff's DSM-V diagnoses was ongoing "cannabis abuse with psychotic disorder with delusions." Tr. 866.   Indeed, the treatment notes strongly indicate that the exacerbations of Plaintiff's most-serious mental health symptoms during the relevant period were usually, if not always, related to her abuse of drugs.   Furthermore, the plethora of symptoms that Holyoke checked-off in her second functional report (Tr. 943) is not consistent with the mostly-normal mental-status findings reported by other

---

[21] Although Holyoke reported that Plaintiff had reportedly been experiencing delusions when she was admitted to the hospital, she did not indicate that Plaintiff was still presently experiencing delusions or hallucinations. Tr. 858.

treatment providers during most of the relevant period.   Additionally, Holyoke's bald assertion that Plaintiff lacked *any* "useful ability to function" in *any* aspect of unskilled work is inconsistent with both the treatment record and the opinions of Santarpia, Hoffman, and Kamin.

Nor does the Court find that the ALJ ignored evidence supporting Holyoke's opinion.   In that regard, Plaintiff's memo of law does not specifically identify any evidence that the ALJ ignored.   Meanwhile, the ALJ expressly indicated that she had considered all evidence, including all medical opinions and medical evidence, as required by the Commissioner's regulations. Tr. 29, 32.   Moreover, rather than cherry-picking evidence from Holyoke,[22] the ALJ listed every single symptom and opinion expressed in Holyoke's reports. Tr. 34-35.   Additionally, the ALJ expressly discussed that Plaintiff claimed she needed reminders to take showers and help cleaning her apartment; that she claimed to have discontinued her college education and employment due to mental symptoms; that she claimed to have difficulty paying attention and dealing with stress; that she claimed to be able to follow written but not spoken instructions; that she claimed to experience delusions, hallucinations, suicidal ideation, low motivation, depression, anxiety, skin picking, nightmares, and thoughts of cutting herself; that she reported difficulty being around crowds; that she had a "long history of mental health-related diagnoses"; that she had been hospitalized at various times for episodes of psychosis; and that she had been

---

[22] *See, e.g., Michelle J. v. Comm'r of Soc. Sec.*, No. 1:21-CV-00306 CJS, 2023 WL 2623587, at *4 (W.D.N.Y. Mar. 24, 2023) ("Cherry-picking can be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source.") (citation and internal quotation marks omitted).

observed at times by treatment providers to be depressed and anxious, to have a flat affect, to be angry, and to have circumstantial thought content.   And, to the extent that the ALJ's RFC finding differed from such evidence, the ALJ explained the reasons therefor. Tr. 29-36.   The Court therefore finds no merit to Plaintiff's contention that the ALJ ignored evidence that was favorable to her claim.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 7) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 9) for the same relief is granted, and the action is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        September 16, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge